UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RONALD LEMA KUPSKY,

        Plaintiff,

v.                                                Case No. 18-C-385

TERESA MCLAREN, et al.,

        Defendants.

## SCREENING ORDER (AMENDED COMPLAINT)

Plaintiff Ronald Kupsky, who is currently serving a state prison sentence at Waupun Correctional Institution (WCI) and is representing himself, filed a complaint under 42 U.S.C. § 1983, alleging that his civil rights were violated when several members of the Psychological Services Unit of the WCI refused to provide him mental health treatment and thereby caused him to harm himself. On March 27, 2018, the Court granted Plaintiff's motion to proceed without prepayment of the filing fee and then screened his initial complaint pursuant to 28 U.S.C. § 1915A(a). ECF No. 9. At that time, I found that complaint failed to set forth facts plausibly stating a claim with sufficient notice to the defendants of what it is they were alleged to have done that amounted to a violation of his constitutional rights. I therefore ordered the complaint dismissed but granted leave for Plaintiff to amend if he could cure the defects noted in the order. On April 5, 2018, Plaintiff filed a motion to amend his complaint. ECF No. 11. Because I have already given Plaintiff leave to amend, the motion is granted. I will now screen Plaintiff's amended complaint.

## SCREENING OF THE COMPLAINT

The court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The court must dismiss a complaint or portion thereof if the prisoner has raised claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b). A claim is legally frivolous when it lacks an arguable basis either in law or in fact. *Denton v. Hernandez*, 504 U.S. 25, 31 (1992); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989); *Hutchinson ex rel. Baker v. Spink*, 126 F.3d 895, 900 (7th Cir. 1997).

To state a cognizable claim under the federal notice pleading system, the plaintiff is required to provide a "short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain sufficient factual matter "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court accepts the factual allegations as true and liberally construes them in the plaintiff's favor. *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). Nevertheless, the complaint's allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).

## ALLEGATIONS OF THE COMPLAINT

In his amended complaint, Plaintiff alleges that "[t]he defendants (McClaren, De Blanc, Van Buren, Schmidt) failed to provide me with mental health treatment resulting in multiple self-harm issues, and an off-site service at the local hospital ER after a 'suicide attempt.'" ECF No. 11-1 at 2. Plaintiff further alleges that on October 3, 2016, he "spoke to a psychological service unit clinical contact" and told them he "had mental health issues, and did not think [he] would be able to keep

2

from self-harm under my current placement status." *Id.* Plaintiff states he was told he would have to talk to his "main clinical contact," Dr. Teresa McClaren, about placement. Plaintiff alleges that he spoke with Dr. McClaren on October 26, 2016, and she told him that she would not provide him any treatment and that he would have to figure things out on his own. *Id.*

According to Psychological Services Clinical Contact report Dr. McClaren completed, a copy of which is attached to the amended complaint, Plaintiff is a 29 year-old male serving his first adult incarceration who on intake denied any history of mental health treatment in the community and was not taking any psychotropic medicine. There was no mental health diagnosis in his file. Upon arrival at WCI from the reception center at Dodge Correctional Institution, Plaintiff quickly wrote several Psychological Services Requests (PSRs) stating "he cannot tolerate other people and will not move to GP [General Population] when his DS [Disciplinary Separation] time is over." ECF No. 11-2. Plaintiff told Dr. McClaren that his adjustment to WCI was poor because he hates living with people. He stated he had no intention of living and eating with people for the next eighteen years. He denied any fear or anxiety associated with being around others, but instead expressed overt hostility towards anyone who tries to talk to him or expresses too much interest in him. *Id.* Dr. McClaren listed a provisional diagnosis of "other specified personality disorder, with schizoid personality features." She noted the Plaintiff "appears to present with symptoms characteristic of a personality disorder which cause clinically significant impairment in functioning," but because he did not seem to meet all of the criteria for a diagnosis of Schizoid Personality Disorder, the provisional diagnosis appeared prudent. *Id.*

In any event, Plaintiff alleges that he then complained to Dr. Schmidt, Dr. McClaren's supervisor, that he was not getting treatment and asked that he be assigned a new doctor, but Dr. Schmidt refused. Plaintiff filed a complaint with the Inmate Complaint Examiner (ICE) for WCI but

3

in the meantime, Dr. McClaren left WCI and Dr. De Blanc was assigned as his new PSU worker. Plaintiff alleges that he met with Dr. De Blanc in 2017 and she also told him she would not provide treatment. After that meeting, Plaintiff alleges that he was able to "do self harm to the point I was bleeding," which resulted in Dr. De Blanc being removed as his main PSU staff and his placement in Observation status. ECF No. 11-1 at 3. While on Observation, Plaintiff alleges he met with Dr. Torria Van Buren and requested a treatment plan, but she also refused.

According to Dr. Van Buren's April 17, 2017 "Placement / Review of Offender Mental Health Observation" report, which is also attached to the amended complaint, Plaintiff was placed in observation status after he submitted a PSR which stated, "If blood is what you want then blood is what I'll give you." The report notes that Plaintiff had submitted several PSRs reporting suicidal ideation and urges to harm himself over the course of the past week and had multiple crisis contacts. He had been warned that if he continued to report thoughts of self-harm, he would be placed in observation status in order to insure his safety. When Dr. Van Buren went to his observation cell to evaluate him, Plaintiff called her a "fucking leech" and "fucking useless." He asked when he would be released from observation status, but when Dr. Van Buren reminded him of their conversations the previous week where she warned him he would be placed in observation if he continued to threaten harm to himself, he had no further questions. Dr. Van Buren noted no symptoms of severe mental illness or psychosis:

> Mr Kupsky was oriented x4. He maintained good eye contact, and he was well groomed. His thinking was logical, and there was no evidence of thought disorder. Mr. Kupsky did not appear to be attending to internal stimuli during the contact. Additionally, there were no apparent attention or concentration difficulties. Mr. Kupsky demonstrated bright affect, despite cussing at me.

ECF No. 11-2 at 2.

On May 18, 2017, Plaintiff alleges he met with Dr. Grin and, unlike the other members of the PSU staff, she said she would work with him on a treatment plan and placed him on a "feed cell" status, meaning he was able to have his meals in his cell. Shortly thereafter, however, Dr. McClaren returned to WCI and removed Plaintiff from "feed cell" status and again removed treatment. When on August 16, 2017, Plaintiff told Dr. McClaren this would result in his again going on Observation, she said "that's fine." ECF No. 11-1 at 4.

According to Dr. McClaren's "Psychological Services Clinical Contact" report, also attached to the amended complaint, Dr. McClaren met with Plaintiff on August 16, 2017, at his request. Plaintiff reported he was doing well at the moment because he was in a status that allowed him to eat his meals in his cell. He asked to continue on a "feed cell" restriction because "he was not certain he could maintain safely in the chow hall." Dr. McClaren explained that his restrictions would not be extended past August 21, 2017, because he had already been receiving his meals in his cell for three months and did not meet the criteria for a continued restriction. Plaintiff responded that Dr. McClaren was "either racist or a bitch or something." He then demanded to work with a clinician who was no longer at the institution. As to mental status, Dr. McClaren noted Plaintiff was "alert and fully oriented." However, once he was informed he would not have his feed cell restriction extended, he became uncooperative and disrespectful. "He expressed his thoughts and feelings in a clear and organized manner, but attempted to dominate the conversation. He presented with an angry mood, which was congruent with his expressed affect and behavior. He made no reference to thoughts/plans/urges to harm himself or others." ECF No. 11-2 at 3.

Plaintiff alleges that after his meeting with Dr. McClaren he went on Observation status multiple times for "self-harm" and in November of 2017, was even taken to the Emergency Room after a suicide attempt. A November 20, 2017 "Off-Site Service Request and Report" attached to

5

the amended complaint states that Plaintiff drank 4 ounces of Tera-Gel shampoo at shower time in an effort to harm himself. ECF No. 11-2 at 4.

Based on these allegations, Plaintiff alleges that Defendants McClaren, De Blanc, Van Buren, and Schmidt knew of his "mental health issues," his "clinically significant impairment in functioning" and his "self-harm/suicide issues," but refused to give him treatment, thereby risking his health and safety. ECF No. 11-1 at 3. He seeks $12 million in damages and an order directing Defendants to write a letter recommending his removal from WCI to a mental health institution for treatment and placing him in the WCI Behavior Health Unit with a "feed cell" restriction until he is moved. *Id.* at 5.

## THE COURT'S ANALYSIS

In order to state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that: (1) he was deprived of a right secured by the Constitution or laws of the United States and (2) the deprivation was visited upon him by a person or persons acting under color of state law. *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009) (citing *Kramer v. Vill. of N. Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004)); *see also Gomez v. Toledo*, 446 U.S. 635, 640 (1980). Plaintiff's claim is predicated on the principle adopted by the Supreme Court in *Estelle v. Gamble* that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." 429 U.S. 97, 104 (1976). The principle derives from the fact that a prison inmate must rely on prison authorities to protect him from threats to his health and safety—whether illness, injury, or other inmates—that by reason of his confinement he is unable to protect himself. *Id.* at 103; *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

Plaintiff's claim differs from those at issue in *Estelle* and *Farmer*, however, in that the threat to his safety from which he claims the defendants failed to protect him was himself. Plaintiff claims that he suffers from a mental disorder which, though not so severe as to relieve him of responsibility for the crime that led to the sentence he is serving, relieves him of all responsibility for the self-destructive behavior he engages in while serving his sentence and renders those entrusted with his care responsible for any harm he does to himself. It is a common claim in prisoner cases. *See, e.g., Taylor v. Wausau Underwriters Ins. Co.*, 423 F. Supp. 2d 882 (E.D. Wis. 2006); *Bowers v. Pollard*, 602 F. Supp. 2d 977 (E.D. Wis. 2009); *Goodvine v. VandeWalle*, No. 16-C-890, 2018 WL 460121 (E.D. Wis. January 17, 2018). In this case, Plaintiff's claim is that the psychological staff failed to provide him treatment for his serious mental health "issues," which led to his harming himself.

Plaintiff's claim fails because he does not allege what the defendants failed to do that contributed to his injury, other than accede to his demand that he be allowed to eat his meals in his cell. Inmates cannot be allowed to dictate the conditions of their confinement under threat of harming themselves. The allegation that the defendants failed to provide "treatment" is conclusory and fails to state a claim, at least where the claim is that the defendant psychologists failed to provide treatment for a chronic condition such as a personality disorder. Unlike a broken leg or torn Achilles tendon, treatment for chronic mental health conditions is not obvious or routine. Frequently, severe mental illnesses are treated with psychotropic medications, but Plaintiff does not allege he was in need of medication that the defendants failed to provide. Indeed, according to the reports he attached to his complaint, he had no mental health treatment before he began serving his sentence and was not taking psychotropic medication. By his own account, which is corroborated by the reports he attached to his amended complaint, the defendants responded to Plaintiff's requests for attention. They evaluated him at his cell, and placed him in observation status when he continued his threats to

7

harm himself. Plaintiff does not dispute the accuracy of the description of his mental status contained in those reports. His complaint boils down to a claim that Dr. McClaren and the other defendants refused to allow him to continue having his meals served to him in his cell and remain out of the general population, so he harmed himself. If this is enough for a prisoner to bring a federal lawsuit then both the states that must defend against them and the courts that must resolve them will be inundated with self-harm cases. *See Bowers*, 602 F. Supp. 2d at 993 (noting burden inmates that threaten self-harm place on prison staff and comparing dilemma faced by prison officials by such prisoners to a hostage situation where the same person is both the hostage and the hostage taker); *Goodvine*, 2018 WL 460121 at *9 (noting perverse incentives for self-harm in such cases and questioning fairness of imposing civil liability on guards and ultimately taxpayers for failing to prevent sane inmates from self-harm).

Plaintiff's amended complaint also fails to state a claim because it is clear from his allegations that he was not in any imminent danger of harm when he spoke with the defendants. "A risk of future harm must be 'sure or very likely' to give rise to 'sufficiently imminent dangers' before an official can be liable for ignoring that risk." *Davis-Clair v. Turck*, 714 F. App'x 605, 606 (7th Cir. 2018) (quoting *Baze v. Rees*, 553 U.S. 35, 50 (2008) (Roberts, C.J., plurality opinion)). In *Davis-Clair*, the court affirmed the district court's dismissal of a similar complaint at the screening stage. There, the plaintiff informed his social worker and the psychological services unit that he would attempt suicide if he was transferred to a prison away from his family. *Id*. at 605. The program review committee met and decided to transfer Davis-Clair. *Id*. After the committee issued its report, a correctional officer told Davis-Clair that he would be transferred. *Id*. at 606. Davis-Clair told him to "get the psychologist over here because if not you all are going to have to send me to observation." *Id*. The officer told him to pack his things and turned away momentarily. *Id*. Minutes

8

later, the officer returned and discovered Davis-Clair had begun to cut his wrist with a razor blade. *Id*. Davis-Clair sued his social worker, the supervisor of the psychological services unit, and the officer for deliberate indifference to his risk of suicide. *Id*. The Seventh Circuit affirmed the district court's dismissal of the action, explaining that an inmate's remark to a social worker that "he would attempt suicide at some unspecified time after his transfer . . . does not convey and imminent risk." *Id.*

Plaintiff's allegations here fail for the same reason. Plaintiff alleges that Dr. McClaren told him on August 16, 2017, that his "feed cell" restriction was being lifted, yet he didn't engage in self-harming behaviors until later. Similarly, Plaintiff alleges that he engaged in self-harming behavior sometime after he met with Dr. De Blanc in 2017. In both cases, he was placed in observation status, which by itself refutes his claim of deliberate indifference to his risk of self-harm. Based on his own allegations and the attached reports which corroborate his allegations, Plaintiff has failed to state a claim on which relief can be granted.

**IT IS THEREFORE ORDERED** that Plaintiff's motion to amend complaint (ECF No. 11) is **GRANTED**. The Clerk is instructed to docket it and the attached exhibits.

**IT IS FURTHER ORDERED** that this action is **DISMISSED** pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b)(1) **for failure to state a claim**. Having already granted leave to amend, and because it appears there are no facts to support such a claim, the dismissal is with prejudice.

**IT IS FURTHER ORDERED** that the Clerk of Court document that this inmate has incurred a "strike" under 28 U.S.C. §1915(g).

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**IT IS FURTHER ORDERED** that copies of this order be sent to the officer in charge of the agency where the inmate is confined.

Dated at Green Bay, Wisconsin this   14th   day of May, 2018.

>  s/ William C. Griesbach
> William C. Griesbach, Chief Judge
> United States District Court

---

This order and the judgment to follow are final. The plaintiff may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If the plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If the plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. § 1915(g). If the plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.